**UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| HARRIET MOSLEY, for M.T., a minor | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | No. 20-cv-6367 |
| v. | ) | |
| | ) | Judge Rebecca R. Pallmeyer |
| KILOLO KIJAKAZI,[1] | ) | |
| Acting Commissioner of Social Security, | ) | |
| | ) | |
| Defendant. | ) | |

**MEMORANDUM OPINION AND ORDER**

Harriet Mosley, on behalf of her minor child Michael,[2] seeks judicial review under 42
U.S.C. § 405(g) of the Commissioner of Social Security's decision denying Michael's claim for
supplemental security income ("SSI") disability benefits. For the reasons explained here, the court
reverses the ALJ's decision and remands this matter for further proceedings consistent with this
order.

**BACKGROUND**

On August 28, 2017, Ms. Mosley protectively filed for SSI benefits, alleging Michael's
disability began June 17, 2014.[3] (Administrative Record (hereinafter "R") [13] at 85.) The
application asserted that Michael was disabled by attention deficit/hyperactivity disorder

---

[1]    Kilolo Kijakazi is substituted for her predecessor, Andrew Saul, under Fed. R. Civ.
P. 25(d).

[2]    Ms. Mosley is actually Michael's grandmother, but Michael refers to her as his
"mom." (See, e.g., R. 35.)

[3]    On June 17, 2014, Ms. Mosley filed a prior application for SSI on Michael's behalf.
(R. 95). That application was denied in November 2014. (Id.) The ALJ considered the alleged
disability onset date in this case—also June 17, 2014—as an "implied request to reopen" that
prior application. (R. 13.) The ALJ found insufficient grounds to reopen Michael's prior application
(id.), which Ms. Mosley does not challenge here. (See Pl.'s Reply Br. (hereinafter "Reply") at 4
(recognizing that Michael's eligibility for benefits would begin in September 2017 if he were found
disabled as of the August 28, 2017 application date).) In other words, the June 2014 date is
irrelevant to this decision. To justify remand, the court must find that the ALJ erred in determining
the status of Michael's disability as of August 28, 2017.

("ADHD"), anxiety, and oppositional defiance disorder ("ODD"). (R. 86.) Michael's claim was initially denied by the Bureau of Disability Determination Services ("DDS") on November 14, 2017 (R. 93) and again on reconsideration in April 2018. (R. 107.) Ms. Mosley appealed those decisions (R. 124) and requested a hearing before an administrative law judge ("ALJ"), which was held on May 23, 2019. (R. 33.)

ALJ Kendall issued a written decision on January 6, 2020, finding that Michael was not disabled under the Social Security Act. (R. 10–32.) She considered a range of evidence including Michael's medical records, reports from Michael's teachers and mother, Michael's school records, and testimony from Mr. Oberlander, Ms. Mosley, and Michael himself. (*See* R. 14–26 (reviewing evidence in detail).)

The Appeals Council declined to review the ALJ's decision in August 2020 (R. 1–6), rendering it final for the purpose of judicial review. *Butler v. Kijakazi*, 4 F.4th 498, 500 (7th Cir. 2021). Ms. Mosley filed this action on October 27, 2020 [1] and thereafter moved for summary judgment [14].

## I.    Documentary Evidence

The record in this matter is voluminous, and the court's summary is not intended to be comprehensive. *See Gedatus v. Saul*, 994 F.3d 893, 901 (7th Cir. 2021) ("[A]ll summaries must be partial and selective."). Instead, the court focuses on those records which reflect the larger trends in Michael's functioning and records cited by the parties, the ALJ, or the medical expert.

In 2012, when Michael was in prekindergarten, his school district determined that he needed an Individualized Education Program ("IEP") to accommodate his needs. (R. 714.) Michael's initial IEP evaluation noted that he could be "resistant, impulsive and overactive" (R. 715), had tantrums, challenged authority, "and needs a lot of individual attention at school regarding behavior" like hitting and biting other children. (R. 717.)

As part of that process, the school district conducted a psychological evaluation, which indicated "elevated scores in the areas of hyperactivity, aggression, depression, atypicality,

2

withdrawal, attention problems, and functional communication." (R. 629–32.) As of mid-2012, when Michael was three years old, he was not yet taking any psychotropic medications. (R. 635, 700.)

Michael's IEP team[4] reported in September 2013 that Michael had difficulty with "transitions and expectations" and occasionally resorted to aggression. (R. 487.) They decided to keep Michael in a "self-contained [special education] classroom," at least for the first half of the year. (R. 496.) Those September 2013 IEP records show that Michael was not taking any psychotropic medications at the time. (*Id.*)

The record does not reflect exactly when Michael started receiving psychiatric and psychological care. In January 2014, a psychiatrist from Lurie Children's Hospital sent a medication order to Michael's school, noting that Michael was to take five milligrams of Adderall twice a day. (R. 299.)[5] As of February 2014, Michael was being seen at the Bridges Medication Clinic at Northshore University HealthSystem by Dr. Mandy Evans and was diagnosed with ADHD and intermittent explosive disorder, but is not apparent from the record when those diagnoses were made. (R. 1298.) His February 2014 treatment plan implies that Michael had been prescribed medications but does not detail specifics. (*Id.* (discussing plan to "[c]ontinue medication management").) In May 2014, an updated treatment plan added individual and family therapy with Nancy Zinaman—a licensed clinical social worker at the Bridges clinic—"[u]p to 8 times per month." (R. 1296.) Michael would continue to be treated at the Bridges program for several years. (R. 956–1114, 1296, 1300–1413.)

---

[4]     References to Michael's "IEP team" or "team" refer to the group of participants that attended Michael's IEP conferences. (*See, e.g.*, R. 486 (listing IEP participants, like Michael's special education teacher, school administrator, and psychologist)).)

[5]     Adderall is a "central nervous system stimulant[]" that "is used as part of a treatment program to control symptoms of attention deficit hyperactivity disorder." *See* https://medlineplus.gov/druginfo/meds/a601234.html (last visited Sept. 26, 2022). This medication order is the earliest medical record the court has identified, but it does not detail when Michael was seen, his diagnosis, or when he was first prescribed the medication.

3

Also in May 2014, near the end of Michael's pre-kindergarten year, his IEP team noted that Michael's response to "difficult emotions" was to "hide, regress or become aggressive." (R. 452.) Later that year, Michael's teacher reported that he continued "to demonstrate some non-compliance and inappropriate behavior such as saying no or kicking a chair" and that Michael needed "direct support to handle frustrations and disappointments." (R. 442.) Michael's IEP team nevertheless determined that he should be in general education classes for kindergarten with an individual aide to help him. (R. 460.)

By March 2015, Michael's treatment team at the Bridges program had diagnosed him with ADHD and generalized anxiety disorder ("GAD"); it is not clear exactly when those diagnoses were first made. (R. 1132.) Michael's treatment plan called for individual and family therapy up to four times per month. (R. 1133.) While the plan does not list Michael's medications, school records show that he was taking Adderall, Prozac, and Ritalin at various times during the 2014–2015 school year. (R. 276–287, 290, 296–98, 299, 519.) Michael's dose of Ritalin changed several times that year and his doctor eventually decided that Michael should stop taking Ritalin and start taking guanfacine[6] because the Ritalin may have been causing an increase in Michael's "emotionality." (R. 288–89, 293–94, 519.) During this time, Michael continued to receive "private therapy on a weekly basis." (R. 545.)

By spring 2015, when Michael was in kindergarten, the school social worker reported that Michael's outbursts—mostly "yelling and throwing erasers or crayons," and occasionally hitting or biting another student—had decreased in frequency. (R. 518.) At that time, Ms. Mosley told the

---

[6]　　　Guanfacine is used to treat ADHD in children by "affecting the part of the brain that controls attention and impulsivity." *See* https://medlineplus.gov/druginfo/meds/a601059.html (last visited Sept. 26, 2022). Ritalin, the brand name for methylphenidate, is a "central nervous system" stimulant that is used to treat ADHD. *See* https://medlineplus.gov/druginfo/meds/a682188.html (last visited Sept. 26, 2022). Prozac "is used to treat depression, obsessive-compulsive disorder" and "panic attacks," among other things. *See* https://medlineplus.gov/druginfo/meds/a689006.html (last visited Sept. 26, 2022). The record is not entirely clear about when exactly Michael started taking Prozac, but records from 2016 indicate that Michael started taking it "at age 4," which would have been in 2012 or 2013. (*See* R. 820.)

social worker that giving Michael advance notice of plans was helpful for him to handle changes in his routine. (R. 518–19.) Michael's general education teacher noted during the same period that Michael benefitted from an aide "all day to keep him focused." (R. 546.)

In November 2015, shortly after Michael started first grade, his regular education teacher reported he was being "disruptive" in class, for example by "constantly mimicking or repeating what the teacher says." (R. 434.) Michael was suspended in December 2015 and May 2016 for aggressive behavior towards peers and school staff. (R. 266–67.) From December 2015 to May 2016, school staff had to physically restrain Michael five times due to violent behavior. (R. 390–97.)

In March 2016, Michael's psychiatrists at the Bridges clinic increased his Adderall dosage from 10 to 15 milligrams to better manage his ADHD symptoms. (R. 1011.) At some point between March and August 2016, they increased his dosage again from 15 to 20 milligrams. (*See* R. 820 (noting that between January 2016 and August 2016, Michael was "slowly titrated to 20mg" of Adderall).)

In May 2016—near the end of first grade—Michael's IEP team reported that he had refused to participate in classroom activities since February, instead "seeking to be 1:1 with the aide or his special education teacher" and would cry, yell, or walk out of the room when he was asked to return to the task at hand. (R. 402.) Those outbursts "escalate[d] to physical aggression i.e. biting or attempting to bite staff, and hitting and kicking" two to three times per month. (*Id.*) Because of this behavior, Michael was reportedly out of the classroom more than 50 percent of the school day. (*Id.*) Michael's therapist at the Bridges program wrote in an updated mental health assessment that an increase in Michael's Prozac dosage in April was "apparently the trigger" for his increased aggressive outbursts at school. (R. 999.) That dose was decreased again in May. (*Id.*)

In August 2016, during the summer between first and second grade, Michael was admitted to the Partial Hospitalization Program at Lurie Children's Hospital for nine days. (R. 914.) When

he was admitted, Michael was taking Adderall, guanfacine, and Prozac. (R. 820.) Michael underwent various treatments, including individual therapy, group therapy, family therapy, psychiatric assessments, and educational services. (R. 914.) At times, his therapist noted that he was "impulsive, intrusive, fidgety, and easily distracted." (R. 870.) At one point, she noted that Michael "began crying loudly" and continued crying when he was told he could not use an iPad. (R. 880.) Doctors at Lurie Children's opted to increase Michael's dose of guanfacine after consultation with Ms. Mosley. (R. 899.)

At discharge, Michael was diagnosed with ADHD and GAD and the chief complaints noted were "[d]isruptive behaviors, hyperactivity." (R. 914.) The discharge summary said that Michael "responded to treatment and began to demonstrate the use of more adaptive coping strategies." (R. 915.) The program sent home a long list of recommended accommodations for Michael's school to adopt, including maintaining a structured environment with predictable routines and allowing Michael to transition from class to class earlier than his peers. (R. 928.) The program also recommended a "therapeutic placement that is better able to address his intense emotional and behavioral needs." (R. 929.)

Given that recommendation, at Michael's August 2016 IEP conference at the start of second grade, Ms. Mosley requested that Michael be "placed into a therapeutic day school" because she felt that "when Michael is very escalated he is difficult to handle in the regular school." (R. 358.) At that same meeting, Michael's first-grade teacher "shared that where Michael was last year with physically aggressive behaviors, he did not feel the supports" the public school could provide were sufficient. (*Id.*)

The team nonetheless chose to postpone a decision and meet four weeks into the school year to review Michael's progress. (*Id.*) At that meeting, Michael's teacher reported that he was "respond[ing] well to being provided with choices." (*Id.*) Michael's team believed that he should stay at the public school, and Ms. Mosley agreed. (*Id.*)

Michael continued meeting with Ms. Zinaman weekly after his discharge from the Lurie Children's program. On August 16, shortly after he was discharged, Michael told her about the coping skills he had learned, though at times he was disengaged and "appeared sad." (R. 990–91.) Ms. Zinaman's notes from later in August 2016 reflect that Michael's coping strategies were helping him "enjoy himself and follow[] the rules," an improvement in his behavior from earlier that year. (R. 993–94.) A month or so into the second-grade school year, Michael told Ms. Zinaman that he had not had "any major blow ups" so far that year. (R. 994.) In October, Michael told Ms. Zinaman that he had twice cried when he was not prepared for his teacher or his aide to be out of school on certain days. (R. 1010.) Michael still required "multiple prompts to do things around the home" and Ms. Mosley told Ms. Zinaman that his anxiety level was not worse, but not better. (R. 1012.) A few weeks later, Michael told Ms. Zinaman that he got in trouble for "hitting a child on purpose at recess." (R. 1018–19.) In a November 2016 session, Michael reported having kicked an aide, who then had to restrain Michael. (R. 1022.)

A week later, after Michael suffered an asthma attack and spent a long night spent in the emergency room, he was hyperactive and refused to comply with Ms. Zinaman's requests, who called off the session early because they were not making progress. (R. 1038.) The following week, on November 15, 2016, Ms. Zinaman wrote in her notes that Michael had been defiant at school and may have bitten another child. (R. 1040.)

Michael continued weekly therapy into 2017. (*See, e.g.*, R. 1044–45, R. 1051–65.) In late January, Michael had an incident at school where, according to Ms. Zinaman's notes, "he was screaming and yelling and they had the children in the class leave." (R. 1059.) Ms. Mosley told Ms. Zinaman in early February that Michael was having difficulty transitioning back to class after recess and would sometimes "talk[] in baby talk" and disturb other children. (R. 1062.) In March 2017, Michael told Ms. Zinaman that he had threatened to hurt another child at school if the child did not return one of Michael's Pokémon cards. (R. 1069.) Ms. Zinaman praised Michael for sharing and noted the "tremendous progress" Michael had made in sharing his feelings. (*Id.*) Ms.

7

Mosley told Ms. Zinaman that Michael had shown good behavior at home and a "significant decrease in outbursts in school this year." (R. 1073–74.) While Ms. Zinaman's March 2017 notes reflect her belief that Michael had made progress with respect to physical aggressiveness, she also noted that he still lashed out emotionally, like by slamming doors or crying very loudly. (R. 1073.)

In early May, Ms. Zinaman again noted that Michael was only infrequently "acting out physically at school this year," though according to reports from his teachers, he was still "acting silly" and "rolling around on the floor" at times during class. (R. 1094.) But that same day, Ms. Mosley called the nurse at the Bridges clinic to report that Michael was "tearing up the room" at school and needed to be picked up, which prompted Michael's psychiatrist to increase his Adderall dosage from 20 to 30 milligrams. (R. 1096.)

Near the end of second grade, in May 2017, Michael's IEP team noted that he had "made nice growth" and had a "better ability to handle disappointment," but he still had the assistance of an individual classroom aide, behavior monitoring sheet, calming tools, and breaks. (R. 314, 317.) He also continued to display inconsistent behavior, like "loud crying, prolonged silliness or off task behaviors," including "yelling," "crawling around the room" and "using potty language" two to three times per week. (R. 317, 327.) But Michael's physical aggression "decreased a great deal in comparison to last year," with fewer than five outbursts during the year, according to the school administrator. (R. 326.)

On May 23, 2017, Ms. Mosley told Ms. Zinaman that she had not gotten any further calls from the school, Michael was getting his work done, and he was "getting all stars on his behavior chart." (R. 1097.) On May 25, at Michael's medication management appointment, his doctor noted "better control of ADHD symptoms" after the increase in his Adderall dosage and mood symptoms that were "well controlled and stable." (R. 1101.) Because Michael was stable, Ms. Zinaman and Ms. Mosley agreed at Michael's June 20, 2017 therapy appointment that Michael

and Ms. Zinaman would meet every other week, rather than every week, until the beginning of the school year.  (R. 1102.)

In early August, shortly before third grade began, Ms. Zinaman wrote in her treatment notes that Ms. Mosley was pleased with Michael's progress and said Michael was able to focus and accept consequences when he misbehaved.  (R. 956.)  Michael told Ms. Zinaman during a mental health reassessment that he had a "great school year last year" because he was able to listen and when he got upset, he used his "calming tools."  (R. 1108–09.)  In late August 2017, Ms. Mosley told Michael's psychiatrist that his medications—Adderall, Prozac, and guanfacine— were working well.  (R. 962–63.)

For third grade (2017–2018), Michael's accommodations included an individual aide, extended time for classwork, and frequent breaks.  (R. 308–09, 321.)  Michael's IEP for that year noted that he would spend about 18 percent of his time in a special education environment.  (R. 322.)

Ms. Zinaman's late September 2017 notes reflect that Michael was managing his hygiene and homework more independently and was completing chores.  (R. 976.)  Since Michael's third-grade year had begun, there had been no calls home and no violent incidents, and Ms. Mosley had reported to Ms. Zinaman that his medications were helping.  (*Id.*)  But Ms. Zinaman's notes reflect that Ms. Mosley was worried that Michael had been teasing other children.  (*Id.*)  Still, he was making progress: in early October, Ms. Zinaman's treatment notes reflect that Michael "appear[ed] to be stable and functioning well in the school setting."  (R. 984.)  Similarly, Ms. Mosley told Ms. Zinaman that Michael was taking fewer breaks in school, and Michael told Ms. Zinaman that he had not been having tantrums and that his behavior had improved.  (R. 1169.)  Michael told Ms. Zinaman in late October that he did not want to stop coming to see her, but Ms. Zinaman and Ms. Mosley agreed to cut Michael's therapy down to twice a month and "monitor" Michael's progress.  (R. 1171–72.)

In late November 2017, Ms. Mosley reported to Ms. Zinaman that Michael had not had major outbursts at home, though he cried about missing some family members who did not live with him.  (R. 1173.)  Michael told Ms. Zinaman in mid-December that he had gotten in trouble on the bus for yelling and not sitting appropriately.  (R. 1309.)  Later that month, Michael excitedly told Ms. Zinaman about his first play date at a friend's house and about his upcoming birthday.  (R. 1177.)  At a medication management session that same day with his Bridges psychiatrist, Michael was hyperactive but said his medications were working well and helped him focus.  (R. 1310.)

In February 2018, Michael's third-grade teacher reported on a Social Security Administration "teacher questionnaire" that, while Michael was "capable of being on level academically with support, socially and emotionally Michael is not always available to learn."  (R. 770.)  On "bad days," she said, Michael was inconsolable, "crying to the point of hysteria," and hiding under her futon.  (*Id.*)  She stated that those behaviors were "happening more often," with "fits" that could last for a couple of hours.  (R. 770, 772.)  Michael was more rational and easier to communicate with after taking medication.  (R. 776.)  But the teacher noted "obvious," "serious," and "very serious" problems in Michael's attention to and completion of tasks and said that Michael could be "quite defiant when the task/activity is either overwhelming, difficult or not fun for him," which leads to "emotional breakdowns that can last several hours to the point of exhaustion."  (R. 771.)  She reported similarly significant problems with Michael's ability to interact and relate with others and said that Michael was not able to function in general education without major supports, including his personal aide.  (R. 773.)

In a February 2018 session, Ms. Zinaman noted that school officials told her they had found Michael "a bit resistant" and "a bit defiant," which Ms. Zinaman concluded stemmed from Michael "getting overwhelmed with the work that is hard for him."  (R. 1316.)  In late February, Ms. Zinaman wrote in her notes that she had moved up Michael's therapy appointment by a week because he had been intermittently crying in school.  (R. 1318.)  That same day, Ms. Zinaman

happened to be at Michael's school for a meeting, and the school social worker told her that Michael had been "having meltdowns at school." (R. 1320.) Consistent with that report, in late February 2018, Ms. Mosley called a nurse at Bridges to explain that Michael was experiencing increased anxiety and crying at school. (R. 1324.) Michael's doctor increased his Prozac dosage to twenty milligrams. (*Id.*) Michael presented with more anxiety in a March 2018 session and explained that he was worried about getting answers wrong on a test. (R. 1321.)

That same month, Michael was seen by William Skoubis, Psy.D, a consultative examiner hired by DDS. (R. 1186.) Mr. Skoubis reported that Michael's cooperation and effort during the examination was "fair to good," though at times Michael put his head down on the desk or looked out the window. (R. 1186–87.) Mr. Skoubis diagnosed Michael with ADHD and GAD "by history." (R. 1189.)

In April, Michael had a "small tantrum" in class and threw a pillow. (R. 1330.) But Ms. Zinaman told Michael's IEP team that she was pleased that Michael was only crying, rather than "destroying a room." (R. 1332.) By the end of the school year, in May 2018, Ms. Mosley told the school social worker that Michael's socialization skills were improving and that his peer relations were "the best they have been." (R. 1212–14.) The social worker reported that Michael "has shown positive school adjustment" and "an increased tolerance to engage in emotional conversations" and that his discipline referrals indicated a "positive trend." (R. 1215.) Notably, as of that time, Michael was still receiving "daily assistance" from a classroom aide. (R. 1217.) During his 2018 IEP reevaluation, the examiner observed Michael crying on two occasions, once while attempting to read a book and once after being asked to undertake a writing assignment. (R. 1218.) He also still needed "assistance to calm down and accept help." (R. 1247.) Around the same time, Michael's psychiatrist increased his guanfacine dosage because he was having problems with impulsivity and hyperactivity when his Adderall wore off. (R. 1336.)

For Michael's fourth grade (2018–2019) school year, his IEP called for a class aide only —not the individual aide he had required earlier—and projected that Michael would spend less

11

than nine percent of his day receiving special education. (R. 1258, 1262.) Ms. Mosley and Michael's therapist Ms. Zinaman noted their concerns about this plan. (R. 1262.) When Ms. Zinaman told Michael he would no longer have an aide to himself, her notes reflect that he started to cry and "worried he might not get his work done." (R. 1338.) By the next session, he was feeling better about not having an aide assigned just to him, and Ms. Zinaman noted that she was proud of his progress and maturation. (R. 1340.) Then in June 2018, when Ms. Zinaman told Michael she was leaving the Bridges program, he burst into tears and sobbed intermittently throughout the session. (R. 1342.)

Behavioral problems continued during the following school year. Michael did not have any therapy during the summer (after Ms. Zinaman's departure), but Ms. Mosley sought additional treatment in September 2018, telling Michael's newly assigned therapist—an intern, Ms. Brookins—that Michael had "worsened since school started a couple of weeks ago" and he realized he had "lost" his previous therapist "for good." (R. 1350.) Michael was having crying fits at school, which Ms. Mosley attributed to missing Ms. Zinaman. (*Id.*) Ms. Mosley told Ms. Brookins that she was nevertheless "overall very happy" with Michael's progress. (*Id.*) Michael met with Ms. Brookins weekly at school. (R. 1350–1389.) At times, Michael was in a "poor" or "low mood" and was resistant to "any kind of activity" except playing games. (R. 1358, 1360, 1362.) Michael at one point told Ms. Brookins that at his summer camp, he had used rocks to attack a boy who bullied him. (R. 1366.)

In December 2018, Michael was prescribed a five-milligram booster dose of Adderall in the afternoon because he was having difficulty focusing and would "roll around on the floor." (R. 1368, 1372.) But Ms. Mosley reported to Ms. Brookins in December that the year had been mostly positive, with fewer "bumps in the road" than in previous years. (R. 1382.)

Ms. Brookins' January 2019 notes reflect that Michael was resistant to continuing therapy. (R. 1384.) His behavior and mood were variable. In late January, Michael told Ms. Brookins that he had been in a fight during recess after other kids taunted him during a basketball game. (R.

1387.)  When Ms. Brookins explained in February that she was a student intern and would be leaving at the end of the spring, he said he was not worried.  (R. 1389.)  But the following week, Michael appeared not to remember the conversation and teared up when she reminded him.  (R. 1391.)  Around the same time, Michael's teacher told Ms. Mosley that Michael put his hands down his pants and then "put his hand in 3 students' faces to 'smell.'"  (R. 787.)  In April, Michael again claimed not to remember about therapy terminating and cried about the idea of going to camp. (R. 1403.)  Michael's final session with Ms. Brookins in late April was productive; they worked through his feelings about going to summer camp and created photo collages together.  (R. 1409.)

In May 2019, Michael's teacher emailed Ms. Mosley to say that Michael "threw a tantrum" after she reprimanded him, and that he "calmed down but was still crying at dismissal."  (R. 785.) In an IEP conference that same month, Michael's team noted that he had "gained good strategies for calming down and [was] working on accessing them when needed."  (R. 1276.)  The team reported that the frequency and duration of Michael's problematic behaviors had improved (*id.*), and the amount of time for which he would require special education for the 2019–2020 year was projected at between 11 and 12 percent.  (R. 1285–86.)

Unlike Michael's third-grade teacher, his fourth-grade (2018–2019) teacher did not report problems with Michael's ability to attend to and complete tasks on the Social Security Administration teacher questionnaire.  (R. 792.)  She did note some "slight" problems in interacting with and relating to others and with Michael's ability to care for himself.  (R. 793, 795.)

## II.     May 23, 2019 Hearing

Michael and Ms. Mosley testified before ALJ Patricia Kendall on May 23, 2019, where they were represented by counsel.  (R.  33–83 (hearing transcript).)  An impartial medical expert, clinical psychologist Mark Oberlander, PhD, also testified. (*Id.*)

### A.     Michael's Testimony

At the hearing, Michael testified that he went to school "pretty much" every day.  (R. 39.) He said he had an aide on the bus and got along with other kids.  (R. 40.)  He testified that PE

was his favorite subject and that he played basketball with his friends.  (R. 41.)  After school, Michael said that he played on his PlayStation console and would do chores like taking out the garbage, washing the dishes, and cleaning his room, though only when his mom asked.  (R. 42.) Michael testified that he "kind of" got along with his siblings, though sometimes he got into fights with them.  (R. 43–44.)  He stated that he took medications, which helped him "stay focused and calm" (R. 44.) and that he had a counselor in school whom he saw "when [he] feel[s] bad," for example when he had a test and needed to be in "a quiet spot" to take it.  (R. 44–45.)  He testified that he sometimes got in trouble for "not listening, or talking back," but agreed that he had more of those issues than when he was younger.  (R. 45.)  He explained that now that he was older, he found it easier to "follow[] directions" and stay out of trouble.  (R. 45–46.)

On questioning from his representative, Michael testified that he often relied on the co-teacher who "helps around the class" and that he sometimes got in fights, like when he pushed another student to the ground at recess.  (R. 47–48.)  He said he sometimes got into trouble at home.  (R. 48.)  He said he had previously met with a counselor during recess, but he was not meeting with her as of the hearing date.[7]  (R. 49.)  Michael stated that he sometimes had trouble paying attention, like during math and reading.  (R. 50.)  Michael said he previously had an individual aide in the classroom who helped him focus.[8]  (*Id.*)

On questioning from Mr. Oberlander, Michael testified that he previously saw a therapist named Nancy—Ms. Zinaman—but he stopped seeing her "about when fourth grade started."  (R. 51.)

---

[7]　　The court assumes Michael was referring to Ms. Brookins, who he saw at school from September 2018 through April 2019 when Ms. Brookins, who was an intern therapist, graduated from her program.  (*See* R. 1350–1409.)

[8]　　As discussed above, Michael's IEP provided for an individual aide in his classroom (separate from his therapist) through the end of third grade (2018).  (*See, e.g.*, R. 1217.) Beginning in Michael's fourth grade school year (2018–2019), he transitioned to a shared, classroom aide.  (R. 1258, 1262.)

### B. Ms. Mosley's Testimony

The ALJ questioned Ms. Mosley next, who testified that, "with the support that he has," Michael was at grade level, and she was "okay with that." (R. 52.) She said that she continued to get calls about once a month from the school. (*Id.*) The most recent of these calls, a couple of weeks before the hearing, came because school staff were having difficulty getting Michael to focus and wanted to verify that Michael had taken his medication. (*Id.*) The issue, Ms. Mosley said, was that Michael was in a bad mood and "refused to do anything," at which point school personnel would typically give him a "brain break" and allow Michael to decide whether to re-engage because otherwise they would face a "meltdown." (R. 52–53.)

When asked whether Michael had improved during the year, Ms. Mosley responded by saying that, over time, she has learned to be "proactive" in managing Michael's behavior, but that the behavioral plan in place at school is still needed because staff members do not know all of Michael's triggers. (R. 53–54.) Indeed, Ms. Mosley acknowledged, things had improved—Michael was getting in trouble less often and was having fewer outbursts, and Ms. Mosley heard from the school less often—but she pointed out that she might not hear about every issue because some are "handled within the classroom." (R. 54–55.) She further noted that, although the combination of the behavioral plan and a change in medications led to improved behavior, the medication caused Michael to sometimes pick at the skin on his hands or feet. (*Id.*) Ms. Mosley observed that at home—where Michael was more comfortable and activities are predictable—his behavior was better. (R. 56.) But, she said, he becomes anxious when away and unfamiliar with planned activities, for example, at a surprise party for a friend. (*Id.*)

On questioning from counsel, Ms. Mosley noted that Michael had previously benefited from having an individual aide in the classroom and that he still relied "a lot" on that same aide, who had more recently transitioned to a class-wide role. (R. 58.) She said that Michael also saw a therapist. (R. 59.) When his first therapist left the program, the separation was "very difficult on Michael" and he saw a new intern therapist for several months. (R. 59–60.) She testified that

15

Michael's biggest challenges were dealing with changes, focusing, and controlling his impulsive behavior. (R. 60.) She said that Michael handles activities and homework well with assistance but is unable to maintain focus throughout a two-hour movie. (R. 61–62.) Finally, Ms. Mosley testified that Michael sometimes needed to use "the calm app" on her phone or have a cup of tea to "slow his mind down enough where he can relax and fall asleep." (R. 62.)

### C. Mr. Oberlander's Testimony

Mark Oberlander, a clinical psychologist and the impartial medical expert, testified last.[9] Mr. Oberlander testified that Michael had "struggles with emotional regulation . . . both in school as well as at home." (R. 65.) He said that the record showed Michael had anxiety and ADHD, for which he took medication, and ODD. (R. 65–66.) He concluded from the record and the testimony at the hearing that there "have been symptomatology of listing level for some period of time, but that significant medical improvement is also noted." (R. 66.) Oberlander said that from the alleged onset date of June 17, 2014 through May 25, 2017—based on the teacher questionnaire, Michael's IEP, and various medical records—Michael had a listing-level impairment. (*Id.*) Oberlander focused on the otherwise-arbitrary May 25 date because one of the medical records from that date noted "better control of ADHD symptoms with an increase in Adderall" and "mood symptoms" that were "well controlled and stable." (R. 67.) Oberlander reviewed various domains of functioning and concluded that Michael was a "responsive, socially aware, somewhat sad, maybe tired, fourth grader who I think has done quite well with, certainly, good care from his mom." (*Id.*)

Mr. Oberlander noted that school records, specifically Michael's April 30, 2019 IEP, showed that he was in special education classes just 11.47 percent of the time for the 2019–2020 school year. (R. 68.) Oberlander said that "the level of service" as of the hearing was "not at

---

[9] Mr. Oberlander had last reviewed the record two days before the hearing, and before it was supplemented with materials from counsel, but Plaintiff did not object to his testimony on this basis. (R. 64–65.)

listing level," but that prior to May 2017, "the recommendation on services were of a much greater intensity." (*Id.*)  For example, he cited the behavioral plan that was established in 2015 and a partial hospitalization program at Lurie Children's Hospital in 2016.  (*Id.*)

The ALJ then clarified for Mr. Oberlander that for a listing-level impairment, one does not consider the "six domains" that Oberlander had referenced earlier.[10]  (R. 69.)  Oberlander responded that, in his understanding, the "B criteria for children's functionality" involved the domains of functioning, but the ALJ explained that "the B criteria is the same as the adult, and then you don't even get to the domains."  (R. 69–70.)  After the ALJ explained the correct "B criteria," Oberlander testified that prior to May 2017, he believed Michael's impairment was "marked" in three out of four of those criteria.  (R. 70–71.)  But Oberlander opined that after May 2017, Michael's impairments were not marked in any of the "B" categories, nor did the "C criteria" apply.  (R. 71.)

The ALJ then directed that—because Michael did not, in Mr. Oberlander's opinion, meet or equal a listing—Oberlander should return to his discussion of the functional domain analysis. (*Id.*)  According to Oberlander, Michael had a less-than-marked limitation in five out of six domains and no limitations in one.  (R. 71–72.)  Oberlander said that, in addition to the May 25, 2017 medical record, he relied on the "overall record" in "more recent times," including an October 3, 2017 record showing that Michael was "doing okay in school" and had "okay capacity for sustained attention," and the fact that Michael's therapy had ended in December 2017.  (R. 72.)

Under cross-examination, Mr. Oberlander conceded that he had relied on Michael's third grade teacher's questionnaire in concluding that Michael was disabled prior to May 2017—but that questionnaire "didn't get created until February of 2018."  (*See* R. 66 (citing report of Michael's teacher as supporting disability prior to May 25, 2017); R. 72–73 (questioning by Michael's

---

[10]     The distinction between establishing disability by meeting or medically equaling a "listing" and functionally equaling a listing—which involves the six domains of functioning referenced by Mr. Oberlander—is discussed in greater detail below.

17

counsel); R. 769–777 (teacher questionnaire dated February 22, 2018).  Oberlander nevertheless asserted that the questionnaire was "supportive of my second set of his functionality assessment"—in other words, that Michael's impairments had improved over time.  (R. 74.)  He reiterated that May 2017—when Oberlander determined Michael was no longer disabled—was "an arbitrary date" because "when you're looking for significant medical improvement, you can't reliably tie it to any one date."  (*Id.*)

Mr. Oberlander then testified that, while Michael's third grade teacher observed very serious problems in two separate domains and said that Michael needed a one-on-one aide to function in general education, he believed that the ratings in the domain of "interacting and relating" were "closer to my understanding of what less than marked would be rather than marked."  (R. 75.)  Oberlander pointed out that "not all children who have aides with them" are disabled for purposes of Social Security benefits, and, because he did not know what Michael's one-on-one aide did, he did not know whether the aide was "heading off possible attention or behavioral troubles."  (R. 76.)

Michael's counsel then asked about the 2018 consultative examination by Mr. Skoubis, which Mr. Oberlander referenced as supportive of his determination that Michael was disabled only up to May 25, 2017.  (*See* R. 66 (citing Skoubis report as supporting disability prior to May 25, 2017); R. 76 (discussion of Skoubis report with counsel for Michael); R. 1186–1191 (Skoubis report dated March 24, 2018).)  Oberlander implied that the report instead supported a finding that Michael was not disabled after May 2017.  (R. 77.)

Counsel also noted that records Oberlander had not reviewed showed that Michael continued receiving therapy through June 2018—months after the December 2017 date when Oberlander believed it had ended.  (R. 72, 78.)  Oberlander nevertheless stood by his conclusions about Michael's impairments and said that Michael had a "very successful therapeutic engagement which resulted in some very positive outcomes."  (R. 78.)

Finally, when asked to explain why he believed the "C" listing criteria were not met for Listing 112.06, Mr. Oberlander explained that, because "medical improvement has taken place," for the two-year period between May 2017 and May 2019, Michael could not "be viewed as exhibiting [only] marginal adjustment." (R. 78–79.) Apparently unsatisfied by this response, the ALJ asked Oberlander for citations to the record that would support his conclusions (R. 79–80), but Oberlander demurred. He asserted that he did not "have access to the record now," but that he relied on "the same evidence that [he] used in order to give [the ALJ] the B criteria ratings"— that there was "appropriate response to medication." (R. 80.) Oberlander acknowledged that Michael's school and home life qualified as a "structured setting," but that Michael nevertheless did not meet Subsection C(2).[11] (R. 81.)

## DISCUSSION

### I. Legal Standard

Children are considered disabled under the Social Security Act if they have a "medically determinable physical or mental impairment, which results in marked and severe functional limitations" that "has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 1382c(a)(3)(C)(i). The regulations establish a three-step process to evaluate whether a child is disabled: First, the child cannot be engaged in any "substantial gainful activity," *i.e.*, work. 20 C.F.R. § 416.924(b). Second, the child must have a medically determinable impairment (or combination of impairments) that qualifies as "severe." *Id.* § 416.924(c). Third, assuming the impairment or impairments are severe, they must then meet, medically equal, or functionally equal the severity one of the "listings" in the Social Security regulations. *Id.* § 416.924(d); *see McCavitt v. Kijakazi*, 6 F.4th 692, 693 (7th Cir. 2021) (observing

---

[11]    As discussed below, Subsection C(2) requires "marginal adjustment," which means that the claimant must have "minimal capacity to adapt to changes" in environment or to demands that are not already part of the claimant's daily life. 20 C.F.R. Pt. 404 P., App. 1 § 112.06(C)(2).

that because the disability analysis for children is not work-focused, officials instead ask "whether the child's limitations meet one of the many listed categories of disability or are functionally equivalent to one of them.").[12]

If an impairment does not meet or medically equal a listing, the ALJ considers six "domains" of functioning to evaluate whether an impairment functionally equals a listing. 20 C.F.R. § 416.926a(b)(1). Those domains are as follows.

(i) Acquiring and using information;

(ii) Attending and completing tasks;

(iii) Interacting and relating with others;

(iv) Moving about and manipulating objects;

(v) Caring for yourself; and

(vi) Health and physical well-being.

*Id.* To functionally equal a listing, the impairment must produce a "marked" limitation in at least two domains of functioning or an "extreme" limitation in one such domain. *Id.* § 416.926a(d). The ALJ must consider the combined effect of all medically determinable impairments, even if a given impairment is not, on its own, severe. *See id.* §§ 416.923, 416.924a(b)(4), 416.926a(a), 416.926a(c). If a child meets the above requirements—in other words, does not engage in substantial gainful activity and has a severe impairment that meets, medically equals, or functionally equals the listings—the child will be found disabled. *Id.* § 416.924.

On judicial review, the court affirms an ALJ's decision "if the correct legal standards were applied and supported with substantial evidence." *L.D.R. v. Berryhill*, 920 F.3d 1146, 1151 (7th Cir. 2019) (citing 42 U.S.C. § 405(g)). "Substantial evidence is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Summers v. Berryhill*, 864

---

[12]    The Social Security "listings" describe those impairments that are considered presumptively disabling.   20 C.F.R. § 404.1525(a); *see* 20 C.F.R. Pt. 404 P., App. 1 (listing impairments).

F.3d 523, 526 (7th Cir. 2017) (internal quotation marks omitted). The evidence supporting an ALJ's decision "must be more than a scintilla but may be less than a preponderance." *Skinner v. Astrue*, 478 F.3d 836, 841 (7th Cir. 2007). In determining whether there is substantial evidence, the court reviews the entire record. *Kepple v. Massanari*, 268 F.3d 513, 516 (7th Cir. 2001). But this court may not "reweigh evidence, resolve conflicts, decide questions of credibility, or substitute its judgment" for the ALJ's. *Burmester v. Berryhill*, 920 F.3d 507, 510 (7th Cir. 2019) (citation and brackets omitted).

The ALJ must explain its decision "with enough detail and clarity to permit meaningful appellate review." *Briscoe ex rel. Taylor v. Barnhart*, 425 F.3d 345, 351 (7th Cir. 2005). In other words, an ALJ must "identify the relevant evidence and build a 'logical bridge' between that evidence and the ultimate determination." *Moon v. Colvin*, 763 F.3d 718, 721 (7th Cir. 2014). The ALJ "may not select and discuss only that evidence that favors his ultimate conclusion," *Diaz v. Chater*, 55 F.3d 300, 307 (7th Cir. 1995), but "must confront the evidence that does not support his conclusion and explain why it was rejected." *Indoranto v. Barnhart*, 374 F.3d 470, 474 (7th Cir. 2004). While a reviewing court gives substantial deference to the ALJ's decision, it must operate as "more than merely [a] rubber stamp." *Scott v. Barnhart*, 297 F.3d 589, 593 (7th Cir. 2002) (citation omitted). If the decision "lacks evidentiary support or is so poorly articulated as to prevent meaningful review, the case must be remanded." *Steele v. Barnhart*, 290 F.3d 936, 940 (7th Cir. 2002).

## II. January 6, 2020 ALJ Decision

In a 15-page decision, ALJ Kendall found that Michael was not disabled under the Social Security Act. (R. 13–27.) She considered a range of evidence, including Michael's medical records, reports from Michael's teachers and mother, Michael's individual education plan records, and testimony from Mr. Oberlander, Ms. Mosley, and Michael himself. (*See* R. 22–23 (listing evidence considered).)

The ALJ found that Michael was a school-aged child as of the application date, was not engaged in substantial gainful activity, and had several severe impairments, including ADHD, GAD, and ODD, which alone or in combination caused "more than a minimal limitation in the child claimant's ability to function compared to other children the same age who do not have impairments." (R. 14–15.) Accordingly, Michael met the first two requirements to be found disabled. *See* 20 C.F.R. § 416.924(b)–(c).

But the ALJ determined that Michael's impairments did not meet or medically equal one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1. (R. 15.) She found that Michael had "no more than moderate limitations" in the paragraph B criteria[13] given Michael's "very obvious functional improvements because of his ongoing treatment and school supports." (R. 15–16.) The ALJ based her decision on Mr. Oberlander's testimony, the prior decisions from DDS—who had reviewed Michael's initial application and request for reconsideration in 2017–2018[14]—and her own independent consideration of listings 103.03 (asthma), 112.06 (anxiety), 112.08 (personality and impulse-control disorders), and 112.11 (neurodevelopmental disorders). (R. 15.)

The ALJ likewise found that Michael did not meet the Paragraph C criteria.[15] (R. 15, 23.) For that decision, she relied on Mr. Oberlander's testimony concerning those criteria, which she

---

[13]  To satisfy the "Paragraph B" criteria relevant here, Michael needed to demonstrate marked limitation in two or extreme limitation in one of the following "areas of mental functioning:" (1) "understand, remember, or apply information"; (2) "interact with others"; (3) "concentrate, persist, or maintain pace"; and (4) "adapt or manage oneself." *See* 20 C.F.R. Pt. 404 P., App. 1 § 112.06(B).

[14]  At the initial application stage in November 2017, DDS determined that Michael did not meet a listing and had a less-than-marked limitation in attending and completing tasks, a marked limitation in interacting and relating with others, and a less-than-marked limitation in health and physical well-being. (R. 88–89.) On reconsideration in April 2018, DDS rated all three of those limitations as less-than-marked—in other words, determining that Michael's limitation in "interacting and relating with others" was less severe than the initial review found. (R. 101–103.)

[15]  To satisfy the "Paragraph C" criteria relevant here, Michael needed to demonstrate a disorder over a period of at least two years with evidence of both: (1) "Medical treatment, mental health therapy, psychosocial support(s), or a highly structured setting(s) that is ongoing and that diminishes the symptoms and signs of your mental disorder" and (2) "Marginal adjustment, that

22

found was consistent with the 2017–18 DDS opinions. (R. 15.) In adopting that conclusion, the ALJ rejected counsel's argument that Michael's need for various structured supports demonstrates that he met the paragraph C criteria. (R. 23 (citing R. 798–99 (post-hearing representative brief)).) She reasoned that "[t]he facts that the claimant is in general education most of the time, no longer has an individual aide, and his 4th grade teacher . . . describes almost no functional issues and has had familiarity since about May 2018, are significant factors to preclude a finding that the C criteria are satisfied." (R. 23.)

Finally, the ALJ determined that Michael's impairments did not functionally equal the severity of any listing. (R. 16.) She found less than marked limitations in five out of six domains of functioning and no limitation in the last one, which were also the ratings Mr. Oberlander suggested. (R. 16, 18.) The ALJ reasoned that the medical evidence showed "significant medical improvement proximate to May 2017," as Oberlander opined. (R. 18.) She noted improvement following an increase in Michael's Adderall dosage, a reduction in therapy, and the May 25, 2017 note cited by Oberlander that there was "better control of ADHD" and mood symptoms that were "well controlled and stable." (R. 19.) The ALJ also concluded that therapy records from June through October 2017 confirmed Oberlander's "assessment of obvious functional and medical improvement within a couple of months in the period under adjudication beginning with the filing of the current application in August 2017." (*Id.*)

Though she recognized "serious problems" reported by Michael's third grade teacher and that Michael still needed assistance to calm down and accept help, the ALJ found that school records showed "positive school adjustment." (R. 20.) She again discussed the decreased frequency of psychotherapy, stability in his medication, and Ms. Mosley's statements that Michael's functioning was improving. (*Id.*) The ALJ stated that "the issue is not whether the claimant functions at the same level as other children his age who do not have impairments."

---

is, you have minimal capacity to adapt to changes in your environment or to demands that are not already part of your daily life." *See* 20 C.F.R. Pt. 404 P., App. 1 § 112.06(C).

Instead, she concluded that, though Michael did have "severe impairments," those impairments caused "less than marked limitations." (R. 21.) Finally, the ALJ found that Michael's termination from the Bridges therapy program in April 2019 heralded a "significant reduction in mental health treatment" and vast improvement in age-appropriate functioning, which was already "obvious in the evidence by October 2017." (*Id.*)

Accordingly, the ALJ found that Michael was not disabled as of August 28, 2017, when his application was filed. (R. 26.)

## III. Analysis

Ms. Mosley now argues that the ALJ erred by: (1) failing to assess Michael's functioning compared to his same-aged peers, instead focusing on how Michael's functioning had improved over time; (2) relying on Mr. Oberlander's opinion, when he had not reviewed the most recent documentary evidence and admitted the date he chose for when Michael no longer met a listing was "arbitrary"; and (3) failing to sufficiently evaluate whether Michael met the paragraph C criteria for disability. (Pl.'s Mem. [15] at 10–15.)

### A. The ALJ Adequately Considered Michael's Functioning Versus His Peers, But Ignored or Misstated Relevant Evidence.

Ms. Mosley first takes issue with the ALJ's assertion that the question is not whether Michael functions as well as other children without impairments. (Pl.'s Mem at 10 (quoting R. 21).) To the contrary, Plaintiff argues, the functional equivalence regulations in fact do require the ALJ to evaluate "how appropriate, effectively, and independently" Michael performed activities "compared to the performance of other children [his] age who do not have impairments." (*Id.* (citing 20 C.F.R. § 416.926a(b)).) Without fully adopting Plaintiff's primary argument, the court does conclude that the ALJ mischaracterized evidence in a way that requires remand.

#### 1. The ALJ Applied the Correct Standard.

Ms. Mosley argues the ALJ's statement shows that she was "considering the issue as [a] binary finding"—that Michael did not operate at his peers' level—"instead of an issue of degree

that informs the domain limitation findings." (Pl.'s Reply at 7.) Because the ALJ "repeatedly" focused on how Michael's functioning had improved over time—in other words, comparing his impairments to his past self, rather than to other children—Ms. Mosley argues she failed to apply the proper standard. (*Id.*)

As Plaintiff sees things, the ALJ focused exclusively (and improperly) on Michael's improvement over time, but that ignores the larger context. In reviewing the ALJ's determination, this court is free to consider "elaboration and analysis appearing elsewhere in the decision." *Zellweger v. Saul*, 984 F.3d 1251, 1254 (7th Cir. 2021). In doing so, the court notes, first, that, before conducting any analysis, the ALJ explicitly cited the standard in 20 C.F.R. § 416.926a. (*See* R. 16.) And there is no indication in the record that the ALJ did not follow the right benchmark—same-aged peers—when she determined that Michael's limitations were "less than marked" (*id.*), a finding that was necessarily in comparison to some other group. To the contrary, the ALJ cited Michael's academic progress, which is "at grade level" (R. 19) and his most recent IEP, which placed Michael in general education (*i.e.*, with his non-impaired peers) for 90 percent of the time. (R. 20.) In finding Michael's ability to acquire and use information was not markedly limited, the ALJ specifically stated that the question was "what degree of limitation he has compared to children of the same age who do not have impairments," and reasoned that Michael had "not been retained in any grade, and he is primarily in regular education." (R. 23–24.) Likewise, in evaluating Michael's ability to attend and complete tasks, the ALJ cited his fourth-grade teacher's report and noted that his "functioning appears to be age-appropriate." (R. 24.)

The ALJ's shorthand references to "improvements" could have more clearly delineated that she was comparing Michael's earlier behavior vis-à-vis his peers with his recent, improved behavior vis-à-vis peers. Likewise, the ALJ's remark that "the question is not whether the claimant functions at the same level as other children his age who do not have impairments" (R. 21) is confusing without further context. The court is nevertheless satisfied that she applied the correct standard. Reading the opinion as a whole, the ALJ's repeated discussions of Michael's

improvements reflect her reasoning that, while Michael may have once had marked limitations compared to his peers, as of the date of his application, his limitations were less than marked. (*See* R. 21 (noting "steady" improvement in "age-appropriate functioning" despite Michael's "severe impairments").) Most notably, the ALJ reasoned that Michael's mental health treatment records shows "vast improvements in the claimant's *age-appropriate functioning*." (R. 21) (emphasis added); *cf. Johnson v. Berryhill*, No. 17-cv-1871, 2018 WL 1726422 at *3 (N.D. Ill. Apr. 10, 2018) (remanding where ALJ noted improvements in child's school performance "but did not describe what this meant for [her] functioning *relative to her non-disabled peers*"). In the end, the court concludes that the ALJ adequately applied the appropriate standard under 20 C.F.R. § 416.926a, and that remand on that basis alone is not appropriate. *See Jelinek v. Astrue*, 662 F.3d 805, 811 (7th Cir. 2011) (a reviewing court upholds the Commissioner's decision if, among other things, it "applied the correct legal standards").

> ## 2. The ALJ's Appropriately Evaluated Michael's Functioning, but Her Analysis Relied on a Misreading of Michael's Therapy Records.

Plaintiff's second argument has more traction. Beyond challenging the ALJ's misapplication of the standard, Plaintiff also asserts that the ALJ was wrong about the degree to which Michael's functioning improved relative to his classmates. It is not the court's job to reweigh the evidence, so long as the ALJ built a "logical bridge" between the evidence and her conclusions about how Michael's improvements reflected on his limitations compared to peers. *See Moon*, 763 F.3d at 721. She did so here. For example, the ALJ cited evidence that: Michael did not get in trouble as frequently as he once did (R. 18); Michael was making friends at school and had joined a basketball team (R. 19); a treating psychiatrist noted that Ms. Mosley was "pleased with [Michael's] progress" (*id.*); Michael was going to therapy less often and cooperated while he was there (*id.*); Michael completed his homework willingly and was doing well academically (*id.*); Michael had fewer outbursts at school and was, as a result, in the classroom the majority of the time (*id.*); Michael was in general education for 90% of the time (R. 20); and Ms. Mosley as

recently as April 2019 reported in a summer camp application that Michael had no problems with classmates, expressed his feelings easily, and was cooperative, helpful, and easygoing.  (R. 21.)  The ALJ also stressed that Michael had, as of April 2019, "completed treatment" at the Bridges clinic, which she viewed as "herald[ing] a significant reduction in mental health treatment which verifies" Michael's "vast improvements."  (*Id.*)

Unlike in some other cases, the ALJ here did not rely on "improvement alone as a substitute for analyzing" Michael's "actual functioning."  *See Edwards ex rel. L.T. v. Colvin*, No. 12-cv-7639, 2013 WL 3934228, at *12 (N.D. Ill. July 30, 2013).  The evidence on which the ALJ relied—Michael's ability to make friends, play sports, cooperate in therapy, complete homework, and succeed academically, among other things—did not merely compare Michael to his past self.

Still, in her (appropriate) evaluation of Michael's functioning, the ALJ made some findings of fact that warrant a second look.  On several occasions, the ALJ referenced Michael's decreased need for therapy.  (*See* R. 19 (citing decrease in therapy after increased Adderall dosage); *id.* (noting decreased therapy after improvements in behavior); R. 20 (referencing "objective findings in the medical evidence," including the "decreased frequency of psychotherapy); R. 21 (observing that Michael's conditions "required progressively less medical care"); R. 22 (citing "therapy records" to show that Michael "required significantly less frequent treatment" within 12 months of filing his application for benefits).)  But Michael's therapy decreased from weekly to bi-weekly only from October 2017 to June 2018.  (R. 1172, 1352–1389.)  After a break during summer 2018, Michael resumed weekly therapy in September 2018.  (*Id.*)

While the ALJ may not have intentionally "cherry pick[ed] the medical evidence," as Ms. Mosley urges (Pl.'s Mem. at 11 (citing *Yurt v. Colvin*, 758 F.3d 850, 859 (7th Cir. 2014))), the ALJ did not discuss—and arguably did not recognize—that Michael's therapy increased back to its pre-October-2017 frequency.  Because the ALJ's repeated references to Michael's decreased need for therapy suggest it played a substantive role in her decision, the error causes concern.

27

The ALJ also mischaracterized the record in stating that Michael was "terminated" from (or "completed") the Bridges therapy program. (R. 21.) While that may be true in a literal sense, it ignores the reality that Michael's treatment ended only because his new therapist was a student intern who was leaving the program (R.1389), that his therapist discussed his having a "new therapist in the fall" (R. 1405), and that according to the "termination of treatment summary," Michael would "continue therapy services at a different agency." (R. 1411.) Because the record does not continue into fall 2019, the court cannot determine whether Michael did, in fact, resume therapy. But the records from the Bridges program cast doubt on the ALJ's conclusion that the termination of Michael's treatment "herald[ed] a significant reduction in mental health treatment which verifies the vast improvements" in Michael's functioning. (R. 21.)

In short, the ALJ's decision is clearly based—at least in part—on an incorrect understanding of how frequently Michael was treated and when (or if) his therapy ended. It accordingly "lacks evidentiary support." *Hopgood v. Astrue*, 578 F.3d 696, 698 (7th Cir. 2009). And because that understanding was at least one factor in the ALJ's determination that Michael was not disabled, it is not harmless. *See Keys v. Barnhart,* 347 F.3d 990, 994 (7th Cir. 2003) ("[T]he doctrine of harmless error . . . is fully applicable to judicial review of administrative decisions."); *Scott v. Astrue,* 730 F. Supp. 2d 918, 935 (C.D. Ill. 2010) ("Harmless errors are those that do not affect the ALJ's determination that a claimant is not entitled to benefits."). On remand, the ALJ should consider whether Michael's full therapy records support a finding of disability.

### B.     The ALJ Erred in Crediting Mr. Oberlander's Testimony.

Next, Ms. Mosley argues that the ALJ should not have credited Mr. Oberlander's medical opinion because: (1) he had not reviewed the most recent records; (2) he misunderstood the disability criteria; and (3) he chose an arbitrary date for when Michael's disability ceased. (Pl.'s Mem. at 11–14.) The court agrees with those arguments in part.

It is undisputed that Mr. Oberlander had not reviewed Michael's December 2017 through April 2019 records at the time he testified. (R. 64–65.) True, Michael's representative "expressly

28

did not object" to Oberlander testifying without having reviewed the later medical records (Def.'s Resp. [18] at 4), but Oberlander's failure to review that evidence did render him unable to opine on Michael's condition after December 2017. Ms. Mosley is also right that Oberlander did not understand the difference between the paragraph B criteria—under which a claimant could "meet a listing"—and the six domains of functioning, which are only relevant if a claimant does not meet a listing. (R. 68–70.)

Those issues, however, do not by themselves invalidate then ALJ's decision. The ALJ recognized that Oberlander "was misinformed about the B criteria" (R. 18) and that his testimony was "not completely well supported by citations to the medical evidence." (R. 23.) Still, in crediting his "overall global assessment," the ALJ specifically noted that it was "consistent with the medical evidence of record and persuasive," suggesting that she did not find his testimony dispositive. (R. 23.)

But two significant problems remain. First, while Mr. Oberlander testified that, in his opinion, Michael met a listing until May 25, 2017 (R. 66), he said on two separate occasions that his choice of that date was "arbitrary." (R. 66, 74.) The Commissioner responds that Oberlander explained why he chose the date: because a medical record noted "better control of ADHD symptoms" and "well controlled and stable" mood. (Def.'s Resp. at 5 (citing R. 67).) But as he later told Michael's counsel, "[w]hen you're looking for significant medical improvement, you can't reliably tie it to any one date." (R. 74.)

Mr. Oberlander's arbitrary cutoff may not have been an issue if the ALJ had relied on other evidence to support her finding that Michael was not disabled as of his application date. But the ALJ's finding that "by May 2017" there was "consistent improvement with appropriate treatment" appears to be based on Oberlander's testimony alone. (R. 19 (discussing Oberlander's citation to the May 25, 2017 medication management report).) The ALJ later noted that "by October 2017" Michael was making "vast improvements in the claimant's age-appropriate functioning" (R. 21.),

29

but Ms. Mosley rightly notes that, if the ALJ had determined that Michael was disabled until October 2017, he would have been entitled to at least one month of benefits. (Pl.'s Reply at 4.)

Put simply, given Mr. Oberlander's failure to review the medical records beyond 2017, it is unclear what "medical evidence of record" the ALJ could have relied on to evaluate whether Michael had, in fact, improved. (R. 23.) As the ALJ recognized, the administrative findings of the DDS reviewing psychologist was limited only to "the period before they made the evaluations," which were in 2017 and early 2018. (*Id.*) Likewise, the DDS consultative examination was in March 2018. (R. 20 (discussing examination).) In other words, at least a year of medical records—from April 2018 through April 2019—went unreviewed by anyone with appropriate qualifications. To the extent the ALJ undertook a review of medical records herself, that was impermissible. *See Murphy v. Astrue*, 496 F.3d 630, 634 (7th Cir. 2007) ("[A]n ALJ cannot play the role of doctor and interpret medical evidence when he or she is not qualified to do so.").[16] The ALJ, knowing that Oberlander did not consider the most recent medical records, should have contacted him "a second time," which "would have been the best way for the ALJ to complete the administrative record and adequately support [her] decision." *Id.* at 635.

Second, Mr. Oberlander's testimony was inconsistent with the record in several ways that went unremarked by the ALJ. For example, Oberlander testified that Michael's treatment with his therapist Ms. Zinaman ended in December 2017. (R. 72.) In fact, Michael continued treatment with Ms. Zinaman through June 2018 and underwent treatment with a new therapist from September 2018 through April 2019. (R. 1342, 1350, 1411.) Oberlander also testified that a February 2018 questionnaire from Michael's third-grade teacher supported his conclusion that Michael was not disabled as of May 2017. (R. 72–73.) Besides the obvious illogic of a February

---

[16]     At times, the ALJ's independent analysis was also flawed. For example, she referenced—without citation—that Michael's medications as of March 2018 "obviously had proven to be effective" because they "had not been adjusted for over 12 months." (R. 20.) But that is wrong. Michael's medication had changed several times during that period. (*See* R. 1096 (documenting May 2017 increase in Adderall dosage); R. 1324 (documenting February 2018 change in Prozac dosage); R. 1336 (documenting April 2018 change in guanfacine dosage).)

2018 evaluation supporting a disability conclusion as of May 2017, Michael's teacher noted many "obvious," "serious" and "very serious" problems that were happening daily or hourly in the domains of "attending and completing tasks" and "interacting and relating with others." (R. 771–73.)

The ALJ cited the questionnaire but observed without explanation that it "confirm[ed] the dramatic improvement with medications." (R. 22.) Of course, "the presence of contradictory evidence and arguments does not mean the ALJ's determination is not supported by substantial evidence." *Gedatus*, 994 F.3d at 903. Still, to be affirmed on judicial review, the ALJ's decision must "explain why [s]he did not credit portions of the record that were favorable to" Michael, like the teacher's report that Michael had obvious, serious, or very serious problems in at least two domains. *See Hopgood*, 578 F.3d at 700. Because her opinion lacked that explanation, the ALJ failed to build a "logical bridge" between the evidence and her conclusions. *Moon*, 763 F.3d at 721; *see also Murphy*, 496 F.3d at 634 (remanding where ALJ did not "adequately articulate his analysis so we can follow his reasoning").

On remand, the ALJ should have the medical expert review the entire record and, if she chooses to disregard evidence that supports a finding that Michael was disabled, should meaningfully articulate her reasoning for doing so.

**C.    The ALJ Erred by Failing to Explain Why Michael Did Not Meet the Paragraph C Criteria.**

Finally, Ms. Mosley argues that the ALJ erred by citing Michael's improvement over time in evaluating whether he met the "C criteria." (Pl.'s Mem. at 14.)

The C criteria for Listing 112.06—the listing Ms. Mosley says Michael meets—require a "medically documented history of the existence of the disorder over a period of at least two years" and "evidence of both: 1. Medical treatment, mental health therapy, psychosocial support(s), or a highly structured setting(s) that is ongoing and that diminished the symptoms and signs of your mental disorder" and "2. Marginal adjustment, that is, you have minimal capacity to adapt to

31

changes in your environment or to demands that are not already part of your daily life." 20 C.F.R. Pt. 404 P., App. 1 § 112.06(C). The ALJ reasoned that because Michael "is in general education most of the time, no longer has an individual aide, and his 4th grade teacher . . . describes almost no functional issues and has had familiarity since about May 2018," he did not meet the C criteria. (R. 23.)

Ms. Mosley responds that Michael's fourth-grade teacher also acknowledged that Michael used supports—like a behavioral intervention plan, medication, an aide, and a calm-down corner—which together show that Michael does not function independently. (Pl.'s Mem. at 14–15.) Ms. Mosley also cites Michael's third-grade teacher's questionnaire, which reported that Michael was "not able to function in a general education setting" without supports, including a "personal assistant for 90% of day." (Pl.'s Mem. at 15 (citing R. 773).)

As discussed above, there is nothing inherently wrong with citing Michael's improved symptoms. But because the ALJ's discussion of the C criteria was very brief, it is difficult to ascertain why she found Michael did not meet them. *See Scott v. Barnhart*, 297 F.3d at 595 ("We have repeatedly admonished ALJs to sufficiently articulate their assessment of the evidence to assure us that they considered the important evidence and to enable us to trace the path of their reasoning.") (quotations, brackets, and ellipsis removed).

In citing evidence only from May 2018 onward, the ALJ also ignored several months after Michael applied for benefits in August 2017. The Commissioner points to Mr. Oberlander's testimony that the C criteria did not apply (Def.'s Resp. at 8 (citing R. 78–81)), but at the hearing, even the ALJ criticized Oberlander for making "declarative statements" that Michael did not meet the criteria "without any sort of evidence to back up what you're saying." (R. 79–80.) Contrary to Defendant's arguments, then, this is a case where the ALJ's assessment "lacks any explanation or support," or at least sufficient support. (*See id.* at 9 (citing *Elder v. Astrue*, 529 F.3d 408, 414 (7th Cir. 2008)).)

There may be reason in the record to determine that Michael does not meet the C criteria, but "what matters are the reasons articulated *by the ALJ*," which in this case were quite minimal. *Jelinek*, 662 F.3d at 812. Because the ALJ did not meaningfully evaluate whether Michael satisfied the C criteria based on the full record, and failed to consider whether Michael met the criteria for any period of time after his application, the court remands on this basis as well. *See Hopgood*, 578 F.3d at 697 (remanding where ALJ made statements that "failed to address portions of medical and school records that were favorable" to the claimant); *Giles v. Astrue*, 483 F.3d 483, 487 (7th Cir. 2007) ("We have not hesitated to remand an ALJ's decision that does not sufficiently articulate the basis for the denial of benefits.").

**D.  Summary**

The court concludes that the ALJ's determination was marred by error. When reviewing a denial of disability benefits, a court may "affirm, reverse, or modify the Social Security Administration's decision, with or without remanding the case for further proceedings." *Allord v. Astrue*, 631 F.3d 411, 415 (7th Cir. 2011) (citing 42 U.S.C. § 405(g)). The court does not believe this case meets the standard for an award of benefits. *See Briscoe*, 425 F.3d at 355 (citation omitted) (noting that awarding benefits is only appropriate if "all factual issues have been resolved and the record can yield but one supportable conclusion").

Therefore, the court remands for further proceedings pursuant to Sentence Four of 42 U.S.C. § 405(g). On remand, the ALJ shall reevaluate Michael's limitations in accordance with this opinion, considering all the evidence and testimony in the record, and shall explain the basis for her findings in accordance with applicable regulations and rulings.

## **CONCLUSION**

The court reverses the ALJ's decision and remands for further proceedings. Civil case terminated without prejudice.

ENTER:

Dated:  September 28, 2022

_____
REBECCA R. PALLMEYER
United States District Judge